UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Alecia Wellman**

   v.                                          Case No. 25-cv-00027-PB-TSM
                                                 Opinion No. 2025 DNH 090

**Amica Mutual Insurance Company, et al.**

## MEMORANDUM AND ORDER

Alecia Wellman brought this action against her former employer, Amica Mutual Insurance Company, and two supervisors after the company issued disciplinary warnings and told her that she would be terminated for anything less than perfect attendance following a period of doctor-recommended mental health leave. Wellman asserts claims under New Hampshire's Law Against Discrimination (LAD), N.H. Rev. Stat. Ann. § 354-A, and the federal Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654. The defendants have moved to dismiss Wellman's LAD claims and her FMLA constructive discharge claim. Doc. 8.

### I. BACKGROUND

**A.    Factual Background**

Wellman started working for Amica as an associate customer care representative on May 3, 2021. Doc. 1 at 3. In October 2021, Wellman

informed her supervisor, Nicholas Komsa, that she was struggling with incoherent thoughts and had difficulty communicating with customers. Id. In response, Komsa told her that leaving work was not considered a reasonable accommodation for these challenges. Id.

On August 11, 2022, after Wellman inquired about a promotion, Amica Director of Management Shaun Ralston told Wellman that "it would be nice if you start showing up. Start taking twenty calls a day. I expect all of my employees to be exhausted by the end of the day, that is the expectation." Id. at 4 (cleaned up). On October 27, 2022, Wellman told Amica Human Resources Representative Hayley Trask that she suffers from Major Depressive Disorder (MDD). Id. at 3. During this conversation, Wellman was shaking and crying and expressed fear about her wellbeing. Id. at 4. When Wellman verbally requested time off to address her disability, Trask suggested that Wellman use Amica's Employee Assistance Program (EAP), a program offering employees assessments, counseling, and referrals. Id. That same day, Trask informed Ralston about Wellman's MDD. Id. Ralston independently contacted Wellman and seconded the recommendation that she use Amica's EAP. Id.

After contacting the EAP, Wellman was referred to New York Life, Amica's disability provider, which opened an intermittent disability claim on

her behalf. Id. On October 28, 2022, Wellman met with Dr. Douglas Dreffer, who confirmed her MDD diagnosis and determined that she was having a severe flare-up of the condition. Id. at 5. Wellman then emailed Trask that she would be unable to work that day due to the flare-up. Id. She sent a second email on October 31, 2022, informing Trask of her non-attendance at work and, on November 1, 2022, submitted a request for time off due to her disability, specifically seeking unpaid leave under the FMLA with a doctor's letter recommending leave until November 6, 2022. Id. Wellman did not work during this period. On November 7, 2022, she emailed Trask that her doctor recommended an additional seven days off and that she intended to return to work on November 14, 2022. Id.

On her return to work, Ralston held a disciplinary meeting in which he told Wellman that her use of medical leave placed an undue burden on other employees. Id. Ralston also warned Wellman that she could be disciplined or fired until her leave requests were officially approved. Id. at 6. He described her over thirty hours of absences as unacceptable. Id.

Between November 7 and December 27, 2022, Wellman communicated with New York Life and Trask about getting her leave request approved. Id. On January 6, 2023, Ralston and Komsa held a second disciplinary meeting with Wellman in which they told Wellman that she would be discharged for

3

excessive absences during her leave unless she displayed perfect attendance and performance going forward. Id. She received a warning letter to this effect during the meeting. Id.

On January 10, 2023, Wellman experienced a panic attack in which she called 911 and was subsequently treated by emergency medical services. Id. at 6-7. On January 11, 2023, Wellman received an email from Amica's Employee Relations Manager notifying her that her January 6 warning letter had been issued because Wellman had used over thirty hours of time off. Doc. 8-2 at 2. According to the email, Wellman had taken a total of 119 hours off in 2022. Id. The email also stated that "[w]hile we hope this time becomes protected [through New York Life], it is important we address your dependability balance through our normal progressive discipline process. If enough hours end up getting protected through NYL to get you below that 30 hour threshold, we will then rescind your Initial Warning."[1] Id.

The next day, January 12, 2023, Wellman submitted her notice of resignation, stating that her last day with Amica would be February 10,

---

[1] The email also indicated that Amica's FMLA/Attendance team had reviewed Wellman's case directly with New York Life, that New York Life had received Wellman's documentation, and that New York Life "estimate[s] this should be reviewed by 1/16/23," upon which the determination would be sent to Amica's Human Resources department. Doc. 8-2 at 2.

4

2023. Doc. 8-3 at 1. Wellman noted that she believed Amica's actions had been a federal offense and that she would "happily comply with all investigations as they begin." Id.

**B.     Procedural Background**

Wellman filed her complaint in this Court on January 13, 2025, without first filing a complaint with the New Hampshire Commission on Human Rights ("the Commission"). Doc. 1; Doc. 8-1 at 4. Wellman asserts LAD claims for disability discrimination, failure to accommodate, retaliation, and aiding and abetting against the individual defendants. She also asserts FMLA claims for interference with her FMLA rights, retaliation, and constructive discharge.

## II.     STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible if it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In testing a complaint's sufficiency, I employ a two-step approach. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011). First, I

screen the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (cleaned up). A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed. Id. Second, I credit as true all of the plaintiff's non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then determine if the claim is plausible. Id. The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct. Twombly, 550 U.S. at 556. The "make-or-break standard" is that those allegations and inferences, "taken as true, must state a plausible, not a merely conceivable, case for relief." Sepulveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

### III. ANALYSIS

Defendants argue that Wellman's LAD claims must be dismissed because she failed to file a complaint with the Commission before bringing this action. They also claim that Wellman's constructive discharge claim must be dismissed because she fails to state a plausible claim for relief. I begin with defendants' challenge to the LAD claims.

6

A.  **Failure to Exhaust LAD Claims**

Defendants base their challenge to Wellman's LAD claims on New Hampshire Revised Statutes Annotated § 354-A:21-a, which provides in pertinent part that

> [a]ny party alleging to be aggrieved by any practice made unlawful under this chapter may, at the expiration of 180 days after the timely filing of a complaint with the commission, or sooner if the commission assents in writing, but not later than 3 years after the alleged unlawful practice occurred, bring a civil action for damages or injunctive relief or both, in the superior court for the county in which the alleged unlawful practice occurred or in the county of residence of the party.

N.H. Rev. Stat. Ann. § 354-A:21-a(I). As defendants read this provision, it plainly requires an aggrieved party to file a complaint with the Commission before filing a civil action for damages in court.

Wellman reads § 354-A:21-a differently. As she sees it, this provision applies only when an aggrieved party elects to file a complaint with the Commission. In all other cases, a plaintiff may file her claim in court without first filing an administrative complaint. I reject this reading of § 354-A:21-a.

Until the New Hampshire legislature adopted § 354-A:21-a in 2000, an aggrieved party did not have a right to enforce the LAD by bringing a civil action for damages in court. Parker v. MVM, Inc., No. 05-cv-380-SM, 2007 WL 1489612 at *6 n.3 (D.N.H. May 22, 2007). Because this provision

7

continues to provide the only path available to an aggrieved person who wishes to base a civil action on the LAD, compliance with its requirements is a precondition to suit. Accordingly, courts that have addressed this issue all agree that a plaintiff must file a complaint with the Commission before bringing an LAD claim in court. See Samora v. UPS-SCS, No. 21-cv-0596, 2021 WL 4949126 (D.N.H. Oct. 25, 2021); Barrows v. State Employees' Ass'n of N.H., No. 19-cv-1048-LM, 2020 WL 419597 (D.N.H. Jan. 27, 2020); Carney v. Town of Weare, No. 15-cv-291-LM, 2017 WL 680385 (D.N.H. Feb. 21, 2017); Wilson v. Port City Air, Inc., No. 13-cv-129-JD, 2013 WL 2631860 (D.N.H. June 12, 2013). Because the LAD requires a complaint to be filed with the Commission before suit is filed, Wellman is simply wrong in contending that she did not need to file a complaint with the Commission.

Wellman's reliance on In re Perkins, 147 N.H. 652, 655 (2002), is also a nonstarter. That case construed § 354-A:25, which merely provides that a person who files a judicial action addressing the same grievance without complying with the procedures provided by the LAD may not later attempt to bring an LAD complaint. See id.; N.H. Rev. Stat. Ann. § 354-A:25. At no point does the decision suggest that an aggrieved party may sue to enforce the LAD in court without first filing a complaint with the Commission.

8

B.  **FMLA Constructive Discharge Claim**

The FMLA entitles eligible employees to "12 workweeks of leave during any 12-month period" for, among other reasons, "a serious health condition." 29 U.S.C. § 2612(a)(1)(D). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a). See Pagan-Colon v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012). To make out a claim under the FMLA, the employee must show that (1) she availed herself of a protected right under the FMLA, (2) she was adversely affected by an employment decision, and (3) there was a causal connection between the employee's protected activity and the adverse employment action. Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998).

To make out an FMLA constructive discharge claim, a plaintiff must show her working conditions were "so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign." E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014). In short, work conditions must have been so intolerable that Wellman's decision to resign was "void of choice or free will" such that her only option was to quit. See Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008). The question in such cases is not whether working conditions were

merely unpleasant or hard, but whether the employer, at the time of the employee's resignation, offered her the opportunity to make a free choice regarding the employment relationship. See id. (citing Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004)). Courts assess this using an objective reasonableness standard. Id. at 52.

According to the complaint, Wellman told Amica on October 27, 2022, that she suffered from MDD. Doc. 1 at 3. After Amica recommended that Wellman make use of its EAP, Wellman opened an intermittent disability claim with New York Life, Amica's disability insurance provider. Id. at 4. Around this time, Dr. Dreffer diagnosed her with a severe flare-up of MDD and recommended she take roughly two weeks off. Id. at 4-5. On November 1, 2022, Wellman formally requested FMLA leave with supporting documentation from her doctor. Id. at 5. On returning to work on November 14, 2022, she was told by Ralston that her leave put an undue burden on other employees. Id. Over the following month, Wellman corresponded with New York Life and Amica's HR about protecting the leave she had taken. Id. at 6. In a disciplinary meeting on January 6, 2023, she was told that she would be discharged for taking "excessive absences" and that anything shy of perfect attendance and performance in the future would lead to dismissal. Id.

10

Defendants argue that the fact that Wellman gave thirty days' notice in her resignation letter, that she offered to comply with investigations, and that she was notified that her disciplinary warning was subject to retraction all work to undermine her claim that she was constructively discharged. I cannot agree.

First, that Wellman provided thirty days' notice does not weaken the plausibility of her FMLA claim. An employee's attempt to preserve continuity, ensure a smooth transition, or avoid sudden financial disruption by giving notice does not obviate the coercive effect of intolerable working conditions. Constructive discharge turns not on the timing or manner of resignation, but on whether the resignation was, in substance, involuntary. See Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). Second, Wellman's offer to cooperate with investigations does not suggest the absence of compulsion, but rather that she believed Amica had violated her rights. Finally, the fact that the formal warning on January 11, 2023, stated that it was subject to retraction depending on the outcome of her FMLA leave request does not make it implausible that on January 12, 2023, she felt she would be fired for taking any more protected leave and had no choice but to resign.

11

Viewing Wellman's allegations under the Rule 12(b)(6) standard, I conclude that her complaint contains sufficient facts to make out a plausible claim that she was constructively discharged following the exercise of her FMLA rights. Dismissal of this count at this early stage is not warranted.

## IV. CONCLUSION

For the foregoing reasons, the defendants' partial motion to dismiss, [Doc. 8](), is granted with respect to Wellman's LAD claims (Counts I, II, VI, & VII) and denied in part with respect to her FMLA constructive discharge claim (Count IV).

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

August 12, 2025

cc: Counsel of Record